## MAGNOLIA PETROLEUM CO. v. BECK.

### No. 12441.

Court of Civil Appeals of Texas. Fort Worth.
March 21, 1931.

Rehearing Denied April 18, 1931.

Lightfoot & Robertson and Nelson Scurlock, all of Fort Worth, for appellant.

McCart, Curtis & McCart, of Fort Worth, for appellee.

CONNER, C. J.

Appellee Beck instituted this suit against the appellant, Magnolia Petroleum Company, on the 22d day of August, 1929. Beck's residence was a frame building situated at a designated place in the city of Fort Worth, in which he operated a dry cleaning establishment. In connection with his business, he had been purchasing naphtha from the defendant company in quantities of five and ten gallons, using the naphtha in an A. B. C. washing machine located in the kitchen of his home. In connection therewith he had constructed what he termed a "clarifier"; the washing machine was located in the center of the kitchen, the clarifier just outside the kitchen on the back porch. Plaintiff would use about eight or ten gallons of liquid at a time in the process of cleaning clothes. The clothes were put in the washing machine and were cleaned by what is termed the pulsation of the agitator which made 104 pulsations per minute. The evidence showed that the operator operated the machine with the top open. After the clothes were cleaned the operator would take them out of the machine compartment and place them in a drier, which made 1,000 revolutions per minute, and by the centrifugal force the liquid was emitted from the clothes into a spout which drained into a bucket set on the floor. Plaintiff's testimony showed that it was his custom to draw the naphtha out of the clarifier into a bucket and pour it into the washing machine as needed; that when he completed washing a few garments he would draw the naphtha out of the washing machine into a bucket and carry it to the back porch where it was poured into the settling chamber underneath the clarifier; then the liquid would be pumped from the settling chamber up into the clarifier.

On Monday, June 3, 1929, plaintiff ordered 55 gallons of naphtha; about noon of the same day the defendant's employee, one Hughes, who was a driver of a truck, called at the plaintiff's residence and delivered 55 gallons (60 gallons as shown by the defendant's evidence) of naphtha, or what was represented to be naphtha. This was poured into the plaintiff's clarifier and used by him that afternoon. About 3 o'clock p. m. June 3d, the plaintiff began his work of cleaning clothes, and the evidence showed that he had repeated the process described above incident to washing three batches of clothes (about 16 or 17 garments). About 4 o'clock of the same afternoon, the plaintiff's nephew, Jimmie Beck, came into the kitchen and struck a match for the purpose of lighting the hot water heater. When he struck the match a flash occurred in the room, followed by a fire. The plaintiff ran to the washing machine for the purpose of closing the lid, and then ran out of the room. The clothes which he was wearing caught fire from which he suffered injuries by reason of the burns. The fire also partially destroyed plaintiff's residence and some of the furniture and fixtures located therein.

In the petition filed by plaintiff it was alleged that the driver of defendant's truck had negligently delivered to plaintiff 30 gallons of naphtha and 25 gallons of gasoline, instead of 55 gallons of naphtha, as ordered by plaintiff, and that such negligence on the part of the employee was the proximate cause of the damages sustained by plaintiff.

In addition to filing a general demurrer and a general denial, defendant pleaded contributory negligence on the part of plaintiff, in that he was operating a dry cleaning establishment and using an inflammable liquid in the kitchen of a frame dwelling house, where there was poor ventilation due to the fact that there were no vents or ventilating fans to take care of the fumes, where there was a stove and a hot water heater in the same room and where matches were kept; that he was guilty of negligence in operating the washing machine with the lid open and in permitting fumes from the inflammable liquid to escape and collect in the room; and that, while this very dangerous condition existed, he permitted his nephew to strike a match for the purpose of lighting the hot water heater.

The defendant also pleaded provisions of the building code of the city of Fort Worth, regulating dry cleaning establishments, which are made applicable to every person "keeping or using more than two quarts of gasoline, naphtha, benzine * * * or other light petroleum of coal tar products for the purpose of dry cleaning for profit or reward." The ordinance pleaded was attached as an exhibit to the defendant's answers, and the defendant alleged that the plaintiff's conduct in violating the provisions of said building code was negligence per se and the proximate cause, or a proximately contributing cause, of the damages sustained by the plaintiff.

Upon the trial the defendant contended vigorously and offered evidence in the form of records, as well as the driver's testimony, tending to show that part of the liquid delivered to the plaintiff could not have been gasoline because the driver had no gasoline on the truck at the time the delivery was made. Furthermore, the defendant offered evidence to show that a sample of the liquid which was delivered by the defendant to the plaintiff was obtained by the fire marshal of the city of Fort Worth from the plaintiff's

clarifier early in the morning following the fire; that a test was made by the Fort Worth Laboratories in order to determine whether the substance was gasoline or naphtha, and that such test revealed beyond a doubt that the liquid was naphtha.

The case was submitted to a jury on special issues, and the jury rendered a verdict to the effect that part of the substance delivered by the driver to the plaintiff was gasoline, that the delivery of such gasoline to the plaintiff by the defendant's driver was negligence, and that such negligence was the proximate cause of the plaintiff's injuries. On the issues of contributory negligence, the jury found that the plaintiff's action in violating the provision of the city ordinance, requiring a building where a dry cleaning establishment is located to be ventilated by means of exhaust fans of sufficient capacity to change the air in the room every three minutes, was a proximate cause of the damages received by the plaintiff. The jury also found that the plaintiff was guilty of negligence in that he failed to use ordinary care to prevent the naphtha from being exposed to fire and flame in the room, and that he was negligent in failing to have the room properly ventilated in order to prevent the fumes from collecting in the room; but, in each instance, the jury also answered that such negligence was not the proximate cause of the injuries sued for. Finally, on the issues of damages, the jury found that the plaintiff had suffered damage to the extent of $6,500, to which was added the agreed value of the personal property destroyed by the fire, and the doctor and hospital expense incurred, making a total of $7,190.26.

The defendant filed a motion for judgment based on the verdict of the jury, but the motion was overruled, and judgment rendered against the defendant on February 3, 1930, for the amount stated above, to wit, $7,190.26. From the judgment so rendered, the defendant has duly prosecuted this appeal.

The defendant urges that the court erred in rendering judgment, notwithstanding the verdict, for the reason that the undisputed evidence shows that plaintiff was conducting a dry cleaning establishment in violation of the City Ordinance No. 1389 requiring ventilation, as indicated in our statement of the case. It is also contended that defendant was entitled to judgment upon the verdict of the jury in finding plaintiff guilty of contributory negligence in failing to conduct his establishment without proper ventilation, etc. It was further urged that the court erred in overruling defendant's motion for a new trial, in that, the jury having found plaintiff guilty of negligence under common-law rules in failing to have his kitchen properly ventilated at the time and shortly before the accident in question, and the evidence having shown that the vapors which collected in the kitchen ignited and caused the flash in the room and that the fire immediately followed, such negligence on the part of plaintiff must have been a proximate cause of the damage sustained by the fire, and the finding of the jury to the contrary should be set aside.

Other alleged errors are assigned to the introduction of the testimony of several of the witnesses, to the argument of counsel, etc., but in view of the conclusion reached by us, we deem it unnecessary to discuss or determine the questions relating to these several matters.

Ordinance No. 1389, which the jury found that the plaintiff had not complied with, appears in pamphlet form entitled "Building Code of the City of Fort Worth, Texas, ordained by the City Council February 28, 1928." To the pamphlet appears the certificate of Henry Keller, assistant city secretary and treasurer, to the effect that "the above and foregoing is a true and correct copy of Ordinance No. 1389, known as the Building Code, adopted by the City Council of the City of Fort Worth at a meeting held on the 28th day of February, 1928, as the same appears of record in the office of the City secretary, recorded in Minute Book B-1 page 390." The ordinance contains many regulations relating to building zones and other matters that have no application to the present controversy, but section 32-7-1 reads as follows: "Every person, firm, or corporation keeping or using more than two quarts of gasoline, naphtha, benzine, benzolene, or other light petroleum of coal tar products for the purpose of dry cleaning for profit or reward shall be held and is hereby declared and defined to be operating a dry cleaning establishment."

After prescribing the height and construction of the building, floors, stairways, doors, etc., it is provided in paragraph 32-7-13 that: "Walls shall have vent holes at the floor line not less than 16 inches in area, not more than 6 feet apart, measured from center to center, which vent holes shall be protected by such walls or by iron bars or screens of large mesh on the outside of such walls."

Paragraph 32-7-14 provides: "Such buildings [cleaning establishments] shall be further ventilated by means of exhaust fans of sufficient capacity to change the air in the building every three minutes and shall be kept in operation at all times during the use of such building. Such exhaust fan shall be located in an air-tight conduit, whose inlet openings shall be at or near the floor level in the wall fartherest away from any other building or structure and the discharge end of such conduit shall be carried over the roof of such building."

Paragraph 32-7-15 reads: "(a) Every such dry cleaning plant shall be equipped with

high pressure steam boiler of sufficient capacity to admit of flooding the dry cleaning and dry rooms with steam in case of fire."

Paragraph 32–7–16 reads: "It shall be unlawful for any person, firm or corporation to carry on or conduct the business of .dry cleaning as herein defined in any dwelling house or in any building, any portion of which is used or intended to be used as a sleeping apartment or dwelling place. No person shall be permitted to sleep in any dry cleaning or dry rooms."

Paragraph 32–7–18 reads: "Dry room shall have an 8 inch vent opening into the atmosphere for each 450 cubic feet of space or fraction thereof; said vent pipe shall be carried up to a height of 2 feet above the roof of building and terminate in an approved ventilator hood."

It is not contended in behalf of appellee, who presents a very forceful brief, that the verdict of the jury, to the effect that the failure to comply with Ordinance 1389 did not constitute negligence, is unsupported by the evidence, or that such violation was not a proximately contributing cause of the explosion resulting in the injuries of which plaintiff complains. The contention is that the verdict in this particular should be wholly disergarded, on the ground that the ordinance is wholly void. This contention is based upon certain charter provisions of the city of Fort Worth and an agreement of counsel relating thereto. The provision of the charter relied upon is to be found in chapter 26 of the charter under the title "Ordinances." Section 1 of the chapter provides that: "All ordinances, resolutions, rules and regulations of the City of Fort Worth heretofore ordained, passed or enacted that are in force at the time this Charter becomes effective, and which are not in conflict herewith, shall remain in full force and vigor, until altered, amended or repealed by the City Council after this Charter takes effect. Provided, that said ordinances, resolutions, rules and regulations have become in effect by the terms of the Charter under which the same were enacted, and provided, further, that the same were valid and authorized by said charter."

Sections 2, 3, 4, 5, and 7 read:

"2. It shall not be necessary to the validity of any ordinance that it be read more than one time or considered at more than one session of the Council. * * * Ordinances not requiring publication shall take effect from and after their passage, unless otherwise therein expressly provided. No publication of any ordinance shall be required excepting those imposing a fine, penalty or forfeiture, or those granting a public easement or franchise, or the general appropriation ordinance, as provided for in the Chapter of this Charter dealing with the appropriation ordinance.

"Revised or digested ordinances published in pamphlet form by authority of the City Council shall not be required to be published in a newspaper, and the publication in pamphlet of such ordinances shall be held and taken as sufficient publication, notwithstanding such ordinance may impose a fine, penalty or forfeiture or should contain a grant of easement or public franchise."

3. "All ordinances of the City of Fort Worth, published or compiled in book or pamphlet form by the City shall be presumed to have been by and with the authority of said City, and shall be admitted as evidence in all courts, State and Federal, without further proof beyond the production of said printed book or pamphlet; and provided further that copies of ordinances, resolutions, minutes and proceedings of the City Council, or prior governing bodies of the City of Fort Worth, certified by the City Secretary to be true copies of the originals, with the seal of the City affixed thereon, shall also be admitted in evidence without further proof in all said courts."

4. "The final passage of an ordinance by the Council and the publication of the same when so required shall be all that is necessary to make such ordinance valid and effective. The approval or signature of the Mayor shall not be necessary."

5. "It shall be the duty of the City Council, as soon as practicable after the adoption of this Charter, to provide for a revision, codification and publication of all the ordinances in force at that time in the City, and thereafter provide for a similar revision and publication as often as they may deem advisable."

7. "All ordinances and resolutions, except ordinances making appropriations, shall be confined to one subject, which shall be clearly expressed in the title. The ordinance making appropriations shall be confined to the subject of appropriations."

It is insisted that the ordinance is in violation of section 7 of the charter, above quoted, in that the title thereof is not confined to one subject. We think this objection may be disposed of briefly. The requirement of the charter is similar to that of our state Constitution, which provides that "no bill * * * which contains more than one subject shall be expressed in its title. * * *"

In the case of Tadlock v. Eccles, 20 Tex. 782, 73 Am. Dec. 213, it is said that the word "object" was not intended in the sense of "provision," as this would render the title of the act as long as the act itself; that the intention of the provision was "to prevent embracing in an Act, having one ostensible object, provisions having no relevancy to that

object, but really designed to effectuate other and wholly different objects, and thus to conceal and disguise the real object proposed by the provisions of an Act under a false or deceptive title."

In Breen v. T. & P. Ry. Co., 44 Tex. 302, it was held that a sufficient compliance with this provision of the Constitution is that the law have one general object which is fairly indicated by its title, though it may embrace different subjects which are connected with or appropriate for the accomplishment of this general object. It was further held that the constitutional provision is entitled to a liberal construction, and that, if the several subjects in the law are germane, one to another, and reasonably appropriate to effectuate the general object of the act, it is sufficient. Indeed, appellant lays but little stress upon this contention, and it will be overruled without further notice. See Consolidated Underwriters v. Kirby Lumber Co. (Tex. Com. App.) 267 S. W. 703.

A further contention earnestly urged is that the ordinance is one imposing a penalty, and that it had not been published for five days in the official newspaper of the city before taking effect, and as evidence of this the following written argument, entered into in behalf of appellant, was offered in evidence on the trial:

"It is agreed for the purpose of the record in this case that on June 28, 1927, the City Council of the City of Fort Worth, a quorum being present, adopted a motion, authorizing the letting of a contract to Stafford Lowdon Company for the printing of a new Building Code, that is, for the printing of 2500 copies of a new Building Code for $1234.00, with additional changes at six cents per line. That acting under said contract, Stafford Lowdon Company set up the galley proofs of said proposed Building Code and that thereafter, after the desired changes, and amendments had been made in the same, that on February 28 1928, the said City Council, by order or motion adopted said purported Building Code, being ordinance No. 1389. That at no time was said proposed Building Code or ordinance No. 1389, either in its original form, or in its amended form, or as finally adopted by the said City Council, published in the official newspaper of the City of Fort Worth, Texas, for five days, or for any other length of time.

"That said ordinance No. 1389 is a penal ordinance, and provides a penalty for the violation of its different provisions.

"That the title or caption of said ordinance No. 1389 is as follows:

" 'Ordinance 1389

" 'An ordinance governing and regulating the construction, erection, raising and wrecking, maintenance, alteration, repairing, remodeling, rebuilding, securing, moving and shoring and the inspection of buildings and structures in Fort Worth and providing for their safety; defining the duties of said office; regulating the installation and use of heating apparatus, boilers, and means of vertical transportation; governing the storage of combustible materials, and providing a penalty for any violation thereof, repealing all existing ordinances in conflict herewith, and declaring an emergency.'

"That the above mentioned authorization for the printing or publication in pamphlet form of said proposed ordinance was the only authorization thereof made by the said City Council.

"That since February 28, 1928, there has been no revision of recodification of all of the ordinances of the City of Fort Worth.

"That said purported ordinance No. 1389 and the publication thereof in pamphlet form, and said pamphlet or book, contains no other ordinance except said ordinance No. 1389, and no part of any other ordinance except said ordinance No. 1389.

"That Chapter 1, section 1-1, paragraph 1-1-2, headed 'Intent and Purpose', reads as follows:

" 'The intent and purpose of this code is to regulate the construction, erection, enlargement, raising, alteration, repair, removal, maintenance, use and height of buildings and structures; to regulate the character and use of materials in and for buildings and structures; to regulate the character and use of certain mechanical equipment in buildings; to establish fire limits; and provide for emergencies.'

"That chapter 1, section 1-1, paragraph 1-1-4 of said purported ordinance is as follows:

" 'Conflicting ordinances repealed. All ordinances or parts thereof, insofar as they conflict with the provisions herein contained, are hereby repealed. Should any section, word or sentence, or any part of this ordinance be held to be invalid, the same shall not be construed to affect any other valid provision of same.'

"The ordinance introduced in evidence is the same ordinance which was purported to be adopted by the City Council on February 28, 1928.

"It is further agreed that the title or caption to ordinance No. 610 is as set out in the caption thereof, attached to the defendant's pleadings, and that said ordinance is a penal ordinance."

Appellee cites the case of Texas Traction Co. v. Scoggings (Tex. Civ. App.) 175 S. W. 1128, 1131, writ denied, which holds that, when the Legislature provides the mode of publication of an ordinance, none other is sufficient to give it validity, and until such publication is had the ordinance is void and

in fact has never become a law. The cases of Woodruff v. Deshazo (Tex. Civ. App.) 181 S. W. 250; Commonwealth v. Kelly, 250 Pa. 18, 95 A. 322, Ann. Cas. 1916B, 48; and Smith Detective Agency, etc., v. Highland Park (Tex. Civ. App.) 5 S.W.(2d) 598, are all to the same effect.

▉▉▉ This court judicially knows that the present charter of the city of Fort Worth was adopted under the Home-Rule Amendment to the Constitution (Const. art. 11, § 5) in December, 1924, and that prior to that time the city had been acting for many years under previous charters, and the record is silent as to whether under any previous charter the city had or had not enacted an ordinance regulating cleaning establishments, and we do not feel quite prepared to say that the written agreement made by counsel must be so construed as that it should be said that the present Ordinance No. 1389 is other than a "revised or digested ordinances" which the city, under the terms of its charter, was fully authorized to enact and have printed in pamphlet form. In terms, the agreement that the ordinance was not published in a newspaper is apparently limited to codified Ordinance No. 1389. We have already quoted from the charter where it is declared that "revised or digested ordinances published in pamphlet form by authority of the City Council shall not be required to be published in a newspaper." As also already shown, the ordinance under consideration appears in the building code of the city in pamphlet form, and the charter further declares that "the publication in pamphlet form of such ordinance shall be held and taken as sufficient publication notwithstanding such ordinance may impose a fine, penalty or forfeiture. * * *" And as also further shown, the charter further specifically provides that "all ordinances of the City of Fort Worth, published or compiled in book or pamphlet form by the City shall be presumed to have been by and with the authority of said City, and shall be admitted as evidence in all courts, State and Federal, without further proof beyond the production of said printed book or pamphlet." And as further appears, the charter made express provision for the revision and digesting of previous ordinances. As it seems to us, under all the circumstances and in view of express terms of the charter, we must overrule the contention that the ordinance is void. If not void, we need not cite authorities to the effect that appellee in conducting his cleaning business in violation of Ordinance No. 1389 was guilty of negligence as a matter of law, which, as the jury found, was the proximate cause of the explosion and following injuries. Nor do we need to cite authorities for the proposition that it was the duty of the court to render his judgment upon the verdict of the jury in answer to material issues. The court therefore erred in rendering a judgment in

favor of appellee non obstante veredicto. However, we are of the further opinion that a proper determination of the verdict of the jury on the issue of appellee's negligence under common-law principles will lead to the same result.

Webster thus defines "naphtha": "Any of the various volatile, strong-smelling, inflammable liquids, as ordinary ether," etc. In 3 Words & Phrases, Second Series, page 517, under the title "Naphtha," it is said: " 'Naphtha' * * * which is a product of petroleum intermediate between the associate products of gasoline and benzine, all of which do not differ in their essential nature, but vary only in the degree of inflammability when brought into contact with radiant heat,"— citing Gately v. Taylor, 211 Mass. 60, 97 N. E. 619, 39 L. R. A. (N. S.) 472.

It will be thus seen that naphtha is classed as inflammatory, together with gasoline and benzine, in the approved definition of the term, in the decisions of the court, and in the ordinance relating to the subject. It may therefore be doubted whether the fact, if admitted, that part of defendant's delivery was gasoline, is very material. The ordinance is made applicable to "every person, firm, or corporation keeping or using more than two quarts of gasoline, naphtha, benzine, benzolene, or other light petroleum of coal tar products for the purpose of dry cleaning for profit or reward."

The undisputed facts show that appellee ordered and received 25 gallons of naphtha in addition to 30 gallons of what he insists was gasoline; that the liquids were received about 12 o'clock, and that he began his cleaning operations about 3 o'clock, and that the explosion occurred about an hour thereafter. It was thought to be necessary and enjoined by the ordinance, among other things, that buildings used, as was appellee's, should not only have vent holes, etc., but should be "ventilated by means of exhaust fans of sufficient capacity to change the air in the building every three minutes and shall be kept in operation at all times during the use of such building."

It is said in Parker v. Barnard, 135 Mass. 116, 46 Am. Rep. 450, citing Salisbury v. Herchenroder, 106 Mass. 458, 8 Am. Rep. 354, that: "Where an act is enjoined or forbidden under a statutory penalty, and the failure to do the act enjoined, or the doing of the act forbidden has contributed to an injury, the party thus in default is liable therefor to the party injured, notwithstanding he may also be subject to a penalty."

The trial court, in entering his judgment, presumably disregarded the jury's finding on the issues of common-law negligence, for the reason that the jury also found that such negligence was not a proximate or proximately contributing causes of the injuries. In

23 Corpus Juris, § 810, the rule is announced that: "Courts may properly take judicial notice of facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence. Other common statements of the rule are that the courts will take notice of whatever is, or ought to be, generally known within the limits of their jurisdiction; and that they ought not to assume ignorance of, or exclude from their knowledge, matters which are known to all persons of intelligence."

Chief Justice Phillips, in his note to the opinion written in the case of Brass v. Texarkana & Fort Smith Railway, 110 Tex. 281, 218 S. W. 1040, 1042, said: "A court cannot blind its eyes to the knowledge of a fact which is notorious throughout its jurisdiction."

In Peterson v. Standard Oil Co., 55 Or. 511, 106 P. 337, 339, Ann. Cas. 1912A, 625, the court said, in speaking of light petroleum products, that: "The use of these distillates has become so general that we think the courts should take notice of their dangerous qualities, especially where the consequences of their use are shown by the complaint to have been accompanied by deadly results. Thus, where gun powder or dynamite are mentioned, no statement in explanation of their dangerous character is necessary because they are so universally known that to name them is at once a suggestion of their dangerous qualities. Courts take judicial knowledge of what is generally known and of facts that have such general notoriety that any one may be fairly presumed to know them."

In Rome Ry. & Light Co. v. Keel, 3 Ga. App. 769, 60 S. E. 468, 470, cited in Central of Georgia R. Co. v. Lawley, 33 Ga. App. 375, 126 S. E. 273, it is said that: "A party will not be permitted to maintain in his pleadings a contradiction of those things of which the court is required to take judicial cognizance. Of the primary physical laws the courts must take notice. 16 Cyc. 854 (8). Therefore the pleading is demurrable when it sets up a contradiction of these laws. Since a physical impossibility cannot exist at all, it cannot be admitted even by demurrer. Such an allegation must be treated by the courts just as they would treat an allegation that what is not law is law; i. e., it must be wholly disregarded."

■ In the light of the principles so announced, how can it be disputed that the negligence as found by the jury on the part of appellee in failing to ventilate his premises so as to permit the escape of the inflammable gas that arose during his operations and use of the quantity of naphtha on hand was not at least a contributing cause of the explosion that occurred and of its consequent injuries? It is a rule well recognized by our decisions that an issue established by an undisputed fact is not a question for a jury's determination, but, on the contrary, in such case, it becomes a question of law for the court. In the case of Eastern Texas Elec. Co. v. Baker, 238 S. W. 335, 336, by the Beaumont Court of Civil Appeals, it is said, quoting from the headnotes: "In an action for willful, aggravated assault and battery, proximate cause is not an issue requiring instruction to jury, and the perpetrator of the act is presumed to have intended the consequences."

In M., K. & T. Ry. Co. v. Hines, 40 S. W. 152, 154, by the San Antonio Court of Civil Appeals, where a member or members of a bridge gang were guilty of negligence in unloading timbers off of a flat car, causing them to fall off and strike a conductor of the train and there was no contributory negligence on the part of the conductor, the court said: "It is apparent that the former's negligence would be the proximate cause, because in that event the sole cause; there being no other or intervening agencies claimed. It seems to us that it would be an absurdity to submit in this connection an issue of whether or not an injury * * * would or could have been foreseen, or whether or not it could have been foreseen that negligence in unloading the timbers might result in their falling off."

■ We conclude, therefore, that while as a general rule the issue of proximate cause is one for the determination of the jury, under the circumstances of this case, the jury's findings of negligence on the part of the appellee under common-law principles must be given effect. We surmise that the jury must have had in mind that such negligence was not the immediate cause. In T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162, 163, it is said by Chief Justice Gaines that: "In ordinary language, a proximate cause is the nearest cause; but, in a legal sense, an act of negligence may be deemed a proximate cause of an injury, although it may not be the last cause in a connected succession of events which have led to a result."

It certainly could not have been legally determined that such negligence was not at least one of the contributing causes to the explosion. We think the undisputed facts show as a matter of law that it was, and that the jury's findings to the contrary should be disregarded.

Without further discussion, we conclude that the court erred in rendering judgment in favor of appellee, notwithstanding the jury's finding, and that we should now and here enter judgment on the verdict that should have been rendered below, to wit, that appellee take nothing by reason of his suit and the defendant go hence without day and recover its costs.

## On Motion for Rehearing.

In addition to what we said in our original opinion with reference to Ordinance 1389, we wish to call attention to section 5 of the charter provisions quoted, which provides that: "5. It shall be the duty of the City Council, as soon as practicable after the adoption of this Charter, to provide for a revision, codification and publication of all the ordinances in force at that time in the City, and thereafter provide for a similar revision and publication as often as they may deem advisable."

■■ The city council was undoubtedly vested with power under the city's home-rule charter to revise, codify, and publish in pamphlet form previous ordinances that were in force, and, Ordinance 1389 appearing in pamphlet form and purporting to be a revision and codification, the presumption exists that the council did what it was right to do and not that which was wrong. In other words, the presumption must be indulged that, in some form, extent, or detail, an ordinance relating to the general subject was in force which it was advisable to revise and codify. And we do not think the written agreement of counsel relating to the subject of publication is sufficiently specific and certain to overcome such presumption. This is especially true when considered in connection with the second paragraph of section 2 of the charter, quoted in our original opinion, and paragraph 1–1–4 of section 1, chapter 1, of Ordinance 1389 (quoted in the agreement of counsel, as set out in our original opinion). The record discloses that Ordinance 1389, as it appears in its pamphlet form, has 37 chapters of 130 sections, printed on 187 pages. It contains many regulations other than those relating to cleaning establishments, and manifestly not of the character of those ordinances required to be published in a newspaper for the benefit of the public at large.

Paragraph 2, of section 2, of the charter, set out in the original opinion, declares that: "Revised or digested ordinances published in pamphlet form by authority of the City Council shall not be required to be published in a newspaper, and the publication in pamphlet of such ordinances shall be held and taken as sufficient publication, notwithstanding such ordinance may impose a fine, penalty or forfeiture or should contain a grant of easement or public franchise."

Paragraph 1–1–4, of section 1, chapter 1, of the ordinance reads: "Conflicting ordinances repealed. All ordinances or parts thereof, insofar as they conflict with the provisions herein contained, are hereby repealed. Should any section, word or sentence, or any part of this ordinance be held to be invalid, the same shall not be construed to affect any other valid provision of same."

It is thus apparent that the city council has been given a very wide power in the matter of printing ordinances in digested and pamphlet form, and when this has been done, as in the present case, paragraph 2, of section 2, of the charter, expressly declares that "the publication in pamphlet of such ordinances shall be held and taken as sufficient publication, * * *" thus presenting a real or apparent conflict with paragraph 1, of section 2, of the charter, which hence may be disregarded by virtue of said paragraph 1–1–4, of section 1, of chapter 1, of the ordinance.

■ From the nature of the subject, it is not to be presumed that the requirement of Suit by J. R. Donges against Orville Beall, be applied to a codification of an entire system of laws on the part of the city. Codification necessarily must include a variety of subjects and many details, and constitute a volume of matter that cannot practically be published in a newspaper, and we are not prepared to say that in a case of codification it is not within the power of the council to embody new features or details germane to the general subject codified.

We accordingly retain the view originally expressed that Ordinance 1389 is valid and enforceable. If so, its violation constituted negligence per se on the part of appellee, and, the jury having found that to have been a proximate cause of the resulting damage, the judgment below should have been for the defendant regardless of the remaining findings.

It follows that our conclusions relating to the issues of appellee's common-law negligence were not necessary to support the general conclusion in our original opinion that the judgment below should be reversed and here rendered for appellant. In view of that fact, we should perhaps reserve our conclusion that the jury's findings that appellee's general want of ordinary care were not the proximate or contributing proximate cause of the damage done to await a final determination of whether the ordinance under consideration was valid and enforceable. Should the Supreme Court determine it to be invalid, we would then at least have the power to determine whether the jury's findings that we ignored are sufficiently supported by the evidence. However, in view of the earnest contention in behalf of appellee that we erred in this particular, we carefully read and considered the entire statement of facts before us, and, while detached portions of the testimony may give color to appellee's contention, we do not feel quite prepared from the whole to say that we were in error. Nevertheless, in view of their immaterial character as we view the case, we have concluded to withdraw for the present what we said in our original opinion relating to the entire lack of evidence to support

the findings of the jury which we ignored, thus leaving that question, or the question of the sufficiency of the evidence to sustain those findings, for future determination should necessity therefor ever become necessary.

Except as just indicated, the motion for rehearing is overruled.